## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**BERTHA SHORTER,**

**Plaintiff,**

v.

**ARCHITECT OF THE CAPITOL,**

**Defendant.**

</td><td>

**Civil Action No. 18-2124 (JDB)**

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Bertha Shorter brought this suit against her former employer, the Architect of the Capitol (the "Architect"), alleging discrimination on the basis of sex and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Congressional Accountability Act of 1995, 2 U.S.C. §§ 1311, 1317(a)(2).  Specifically, Shorter—a Hispanic woman—alleges that the Architect discriminated against her by terminating her employment for misconduct that did not lead to termination for her male and non-Hispanic colleagues.  The Architect has moved for summary judgment, and for the reasons set forth below, the Court will grant that motion.

## Background

### A.  **Shorter's Employment History**

Plaintiff Bertha Shorter is a Hispanic woman who was employed by the Architect for 28 years.  See Mem. of Points and Authorities in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. [ECF No. 31] ("Pl.'s Mem.") at 2.  The Architect oversees custodial operations for the Senate Office Buildings, for instance, by running the cafeteria and providing janitorial services.  See Ex. A, Pl.'s Mem. ("Pl.'s Resp.") [ECF No. 31-2] ¶¶ 3, 5.  Shorter began working at the Architect in 1989 as a cashier at the restaurant in the Hart Senate Office Building and, in 1992, transitioned to janitorial work in the Senate Office Buildings.  Id. ¶ 3–5.  During her employment with the

Architect, Shorter's performance evaluations never fell below "Achieved Expectations" or "Satisfactory."  See Ex. B, Pl.'s Mem. ("Pl.'s Statement of Disputed Facts") [ECF No. 31-3] ¶ 2 (citing Ex. C, Pl.'s Mem. ("Shorter Aff.") [ECF No. 31-4] ¶¶ 2–3).

Despite these reviews, Shorter also had a history of storing items owned by the Architect in unauthorized areas of the Hart Senate Office Building.  Id. at 8 (citing Ex. J, Pl.'s Mem. ("Bailey Dep. Tr.") [ECF No. 32-1] at 32:5–19).   Specifically, in 2005, Shorter received a letter of reprimand and was briefly suspended for storing materials in an unauthorized location, and in 2008, she was again suspended for keeping "supplies, other materials[,] and clothing" in a Senator's office.  Bailey Dep. Tr. at 32:7–16.  While Shorter denies certain allegations related to her ultimate termination, see Pl.'s Resp. ¶¶ 19–27, she does not contest that she was disciplined for storing materials in unauthorized locations, see Pl.'s Statement of Disputed Fact ¶ 42.  Indeed, Shorter explains that she has received a medical diagnosis for "hoarding," a psychological condition that manifests itself in her "collecting items and storing them."  Id. ¶¶ 4–6 (citing Shorter Aff. ¶ 9; Ex. F, Pl.'s Mem. ("Hoarding Disorder Description") [ECF No. 31-7] at 2–5).  This condition, she contends, "leads her to compulsively stockpile supplies in one location."  Id. ¶ 4.

**B.  Allegations Against Shorter**

On December 14, 2016, an anonymous tipper informed the U.S. Capitol Police that "Shorter, her sister, and another co-worker routinely took property not belonging to them and without permission from the Dirksen Senate Office Building and cafeteria and from the Hart Senate Office Building."  See Def.'s Statement of Material Facts as to Which There is No Genuine Issue ("Def.'s SMF") [ECF No. 30-2] ¶ 6; Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. [ECF No. 30-1]  ("Def.'s Mem.") at 2; Ex. 4, Affidavit in Support of an Arrest Warrant [ECF No. 30-6] ("Arrest Warrant Aff.") at 1.  As part of a subsequent investigation, the Capitol Police

obtained a photograph and video evidence of someone believed to be Shorter entering the Dirksen Building with "a small bag" at 10:09 p.m. on December 14, 2016, and leaving through the same door with "an overstuffed bag" at 6:46 a.m. on December 15, 2016. <u>See</u> Arrest Warrant Aff. at 1–6. On May 10, 2017, the Architect's Office of Inspector General ("OIG") received a similar anonymous complaint, reporting that Shorter and two other Senate Office Building employees "ha[d] been stealing supplies and food from the Senate cafeteria." Ex. 5, Def.'s Mot. for Summ. J. [ECF No. 30-7] ("OIG Report") at 1. The complaint alleged that, during breaks, Shorter would enter the Senate cafeteria with a key provided by her sister, who worked in the cafeteria, and take food and drinks that she later placed in her car. <u>See</u> <u>id.</u>

On July 7, 2017, Shorter consented to an interview with Capitol Police Special Agents Kathryn Rivera and James Soltes. <u>See</u> Pl.'s Resp. ¶¶ 13–14; Arrest Warrant Aff. at 1. Shorter asked to use the bathroom before starting the interview, and Shorter and Rivera entered a restroom together. <u>See</u> Pl.'s Resp. ¶ 14; Arrest Warrant Aff. at 1. Shorter went into a handicap stall by herself, and shortly thereafter, Rivera began hearing "unusual paper crinkling and zipping noises coming from the stall occupied by [Shorter]." Arrest Warrant Aff. at 1–2.

Rivera inquired if everything was all right, and after hearing no response, she opened the stall and saw Shorter fully clothed and facing the toilet with her bag unzipped near the wall. <u>See</u> Pl.'s Resp. ¶ 17; Arrest Warrant Aff. at 2. She states that Shorter was in the process of placing two toilet paper rolls and a vacuum-cleaner bag, all of which were the property of the Architect, on top of the toilet paper dispenser. <u>See</u> Pl.'s Resp. ¶ 17; Arrest Warrant Aff. at 2. According to Rivera, Shorter then stated that she needed to "get rid of it." <u>See</u> Pl.'s Resp. ¶ 18; Arrest Warrant Aff. at 2.

After finishing in the restroom, Rivera and Soltes began the interview with Shorter.  See Pl.'s Resp. ¶ 19; Arrest Warrant Aff. at 2.  According to Rivera's sworn affidavit, Shorter said that she did not want to go to the store that day, so she took the toilet paper rolls and vacuum-cleaner bag without permission and then tried to get rid of them in the bathroom for fear of getting in trouble.  See Pl.'s Resp. ¶ 20; Arrest Warrant Aff. at 2.  Shorter also admitted that, "[o]nce a night, every night for her entire twenty-eight years of employment with the [Architect]," she would "acquire cleaning supplies at the beginning of her shift . . . , deliberately hide them in her book bag . . . , take them to her car; and take them home."  See Arrest Warrant Aff. at 2.

According to Rivera's affidavit, Shorter also confessed to removing items—"typically food and juices"—from the cafeteria without authorization "once or twice a week," often with her sister's help.  See Arrest Warrant Aff. at 2–3.  She also admitted to accessing a secured ice machine from which she obtained bags of ice without authorization.  See Pl.'s Resp. ¶ 24; Arrest Warrant Aff. at 3.  And Shorter stated that she entered Senators' offices, which she was not authorized to access, and took "notepads, ledgers, pens, and supplies" in order to distribute them among her coworkers and family members.  See Pl.'s Resp. ¶ 25; Arrest Warrant Aff. at 3.  Rivera recovered three such notepads from one of Shorter's coworkers, and both Shorter and the coworker confirmed that Shorter had removed the notepads without permission and given them to the coworker.  See Arrest Warrant Aff. at 3.  Following the interview, the Special Agents searched Shorter's work locker, where they found dozens of the Architect's items whose total monetary value came to $164.08.  See Pl.'s Resp. ¶ 27; Arrest Warrant Aff. at 3; Ex. 6, Def.'s Mot. for Summ. J. [ECF No. 30-8] ("Recovered Items List") at 2–16.

Shorter disputes several parts of Rivera's account as memorialized in the affidavit.  First, she denies stating that she took the cleaning supplies to her vehicle, explaining that she instead

confessed to taking the supplies to her cleaning cart, which remained on the premises.  Pl.'s Resp. ¶ 21 (citing Ex. I, Pl.'s Mem. ("Shorter Dep. Tr.") [ECF No. 32] at 25:16–27:12).  She emphasizes that, when Rivera examined Shorter's car without prior notice, the vehicle did not contain any items belonging to the Architect.  Id. (citing Shorter Dep. Tr. at 27:13–16).  Shorter also notes that she "entered the cafeteria on [only] one occasion when [she] was observed retrieving food and eating food," which she states was "from the restaurant" and had been "left there by [her] sister."  Shorter Aff. ¶ 12.  And she questions the accuracy of her coworker, who accused Shorter of removing three notepads from a Senator's office, pointing out that the coworker herself had admitted to taking the two "leather notebooks" found in her bag.  See OIG Report at 4–5; Pl.'s Resp. ¶ 26.

### C. Shorter's Termination

On August 22, 2017, Shorter was criminally charged with second-degree theft in violation of D.C. Code §§ 3211 and 3212(b), and a warrant was issued for her arrest.  See Pl.'s Resp. ¶¶ 30–31 (citing Arrest Warrant Aff. at 1; Ex. 7, Def.'s Mot. for Summ. J. ("Docket Summary") [ECF No. 30-9] at 1).  Shorter was arraigned and pled not guilty, but on October 5, 2017, she entered a deferred prosecution agreement that required her to complete community service.  See id. ¶¶ 32–33 (citing Ex. 8, Def.'s Mot. for Summ. J. ("Docket") [ECF No. 30-10] at 1–2).

On October 25, 2017, the Assistant Superintendent of the Senate Office Buildings, Jean Gilles, circulated a memorandum proposing that Shorter be terminated based on "theft and the violations of the Standards of Conduct."  See Pl.'s Resp. ¶¶ 40–41; Ex. 9, Def.'s Mot. for Summ. J. ("Mem. re Senate Discipline") [ECF No. 30-11] at 1–2.  The following week, on October 31, the OIG submitted to the Architect a report of its investigation into Shorter's conduct.  See id. ¶¶ 34–36; OIG Report at 1.  Relying on the Capitol Police investigation, the OIG Report

determined that Shorter had violated the Architect's Standards of Conduct—specifically, by "removing from any office, space[,] or area within Capitol Grounds or otherwise under the jurisdiction of the [Architect] any equipment, supplies, materials[,] or other government property," "by committing theft of government property," and by failing to "give full value and service to the [Architect]."  See OIG Report at 2–3; Pl.'s Resp. ¶ 37.  The report concluded that Shorter had violated D.C. Code § 22-321, theft in the second degree, by appropriating property "valued less than $1000."  OIG Report at 3; see Pl.'s Resp. ¶ 37.

In a letter dated November 2, 2017, Gilles informed Shorter that he had proposed her termination.  See Pl.'s Resp. ¶ 41; Ex. 10, Def.'s Mot. for Summ. J. ("Nov. 2 Gilles Letter") [ECF No. 30-12] at 1–3.  In the letter, Gilles stated that, despite Shorter's deferred prosecution agreement, her "conduct was so egregious that removal [was] warranted."  Id. at 3.

On December 11, Shorter responded with a letter addressed to Taxiarxis Tzamaras, the then-Superintendent, who had final authority over her termination.  See Pl.'s Resp. ¶¶ 44–45; Ex. 11, Def.'s Mot. for Summ. J. ("Letter to Tzamaras") [ECF No. 30-13] at 1; Pl.'s Statement of Disputed Facts at 8 (citing Ex. L, Pl.'s Mem. ("Tzamaras Dep. Tr.") [ECF No. 32-3] at 6:1–11).  Shorter denied "that she [had] engaged in the conduct as described by the [Architect] in the Proposed Removal," but did not specify the ways in which her actions diverged from the depicted behavior.  See Letter to Tzamaras at 4; Pl.'s Resp. ¶¶ 46–47.  Shorter also wrote that—even if the Architect determined that there was sufficient evidence of misconduct—termination would be "unnecessarily harsh" and "unreasonably severe" in light of "the mitigating circumstances at issue in this case," specifically, her job level and type of employment, her past work record, and her hoarding condition.  See Letter to Tzamaras at 1–4.

Nevertheless, for the reasons stated in Gilles's November 2 letter, Tzamaras terminated Shorter's employment effective January 18, 2018.  See Ex 12, Def.'s Mot. for Summ. J. ("Jan. 12 Termination Letter") [ECF No. 30-14] at 1.

## Legal Standard

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1).

In determining whether a genuine dispute of material fact exists sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249–50 (citations omitted).  Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

Recognizing the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent, courts should approach summary judgment in such actions with "special caution." Hayes v. Shalala, 902 F. Supp. 259, 263 (D.D.C. 1995). Nevertheless, plaintiffs in such cases are not relieved of their obligation to support their allegations with competent evidence, Brown v. Mills, 674 F. Supp. 2d 182, 188 (D.D.C. 2009), and "bear[] the burden of production to designate specific facts showing that there is a genuine dispute requiring trial," Mason v. Geithner, 811 F. Supp. 2d 128, 175 (D.D.C. 2011) (citing Ricci v. DeStefano, 557 U.S. 557, 585 (2009)).

## Analysis

Shorter claims that the Architect terminated her employment because she is a Hispanic woman. See Pl.'s Mem. at 1. According to Shorter, despite her "stellar" past job performance and the mitigating circumstances of her hoarding condition, the Architect treated her worse than it did several male and/or non-Hispanic employees whose misconduct was comparable to hers. Id. Taking its cue from the parties, the Court will examine both Shorter's sex-based and race-based claims of discrimination together, rather than separately. See Stoe v. Barr, 960 F.3d 627, 640 (D.C. Cir. 2020) (analyzing as a whole, rather than separately, "evidence . . . in relation to [plaintiff's] age and sex discrimination claims").

Title VII prohibits employers from discriminating against "any individual" on the basis of sex or race, among other characteristics. See 42 U.S.C. § 2000e–2(a)(1). In the absence of "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic," the Court analyzes Title VII discrimination claims under the burden-shifting framework of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Young v. United Parcel Serv., Inc., 575 U.S. 206, 212–13 (2015).

Under that framework, a plaintiff must first make out a prima facie case of discrimination by demonstrating that "she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination."  Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (citing Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002)).  If the plaintiff demonstrates a prima facie case, "the burden of producing a non-discriminatory explanation for the challenged personnel action" shifts to the employer.  Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (citing McDonnell Douglas, 411 U.S. at 802–03).  But if the employer satisfies this burden by proffering such nondiscriminatory explanation, then the burden shifts back to the plaintiff to prove that the reason provided by the employer was merely pretextual and that the adverse employment action was, in fact, a product of intentional discrimination.  Id.

The D.C. Circuit has advised that, "if the employer clearly presents a nondiscriminatory reason, [an] analysis of the prima facie factors at summary judgment becomes gratuitous."  Figueroa v. Pompeo, 923 F.3d 1078, 1086 (D.C. Cir. 2019).  The Architect has done that here, explaining that it terminated Shorter because, at minimum, she surreptitiously stored in unauthorized areas items that she had obtained from around the Architect's premises.  See Def.'s Mem. at 10; Nov. 2 Gilles Letter at 1–4.  Thus, the Court turns to whether the Architect has "proffer[ed] admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions."  Figueroa, 923 F.3d at 1092.

### A.  **The Architect's Proffered Explanation**

In Figueroa, the D.C. Circuit enumerated four factors that it deemed to be "paramount" for evaluating whether an employer has satisfied its prong-two obligations under McDonnell Douglas to demonstrate a permissible explanation for its adverse employment action: (1) "the employer

must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) assuming the credibility of the evidence, the factfinder "must reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason"; (3) "the nondiscriminatory explanation must be legitimate [or] 'credible' in light of the proffered evidence"; and (4) "the evidence must present a 'clear and reasonably specific explanation'" so as to give the employee a proper chance to show that it is "pretextual." Id. at 1087–88 (citations omitted).

The Architect satisfies each of these elements. First, the Architect has produced admissible evidence showing that it fired Shorter because it believed that she had violated the Architect's code of conduct and, likely, D.C. criminal law. See Def.'s Mem. at 10–11; OIG Report at 1–3. Special Agent Rivera provided the Architect with clear grounds to think that Shorter "confessed to an extensive and ongoing practice of stealing from the Architect, including daily appropriation of cleaning supplies, breaking into the cafeteria using a credit card to steal food, and going without permission into Senator's offices to steal office supplies." See Def.'s Mem. at 10–11; Arrest Warrant Aff. at 1–6. Moreover, Shorter's removal notice cited the unauthorized possession of government property as the basis for her termination. See Nov. 2 Gilles Letter at 1. The Architect has also provided ample admissible evidence to support this explanation, including the OIG's Report of Investigation, see OIG Report at 1–7, a list and photos of items recovered from Shorter's locker, see Recovered Items List at 2–16, docket excerpts from the criminal case against Shorter, see Docket Summary at 1; Docket at 1, and documents showing the internal decision-making behind terminating Shorter as well as the Architect's correspondence with her, see Mem. re Senate Discipline at 1; Nov. 2 Gilles Letter at 1–5; Jan. 12 Termination Letter at 1. Shorter does not contest the admissibility of these documents.

Second, a factfinder assuming the credibility of this evidence could easily conclude that the Architect's motivation for terminating Shorter's employment was non-discriminatory. The Architect thought that Shorter had admitted to a nearly thirty-year practice of "wrongfully obtain[ing] and us[ing] property of value [] belonging to the [Architect], consisting of food, kitchen and office supplies, for [her] own use and depriv[ing] the [Architect] of a right to and benefit of the property." Nov. 2 Gilles Letter at 3. Even if Shorter did not engage in all of the misconduct alleged, see Pl.'s Resp ¶¶ 6–27, Shorter's termination was reasonable based on what the Architect believed at the time. See George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").

Third, the Architect's explanation is "legitimate," or "'credible' in light of the proffered evidence." Figueroa, 923 F.3d at 1088; cf. Bishopp v. District of Columbia, 788 F.2d 781, 788–89 (D.C. Cir. 1986) (concluding that a proffered explanation was not "credible" because it was "internally inconsistent" and, ultimately, not "plausible"). The evidence reveals that the Architect's decision was based on a sworn affidavit from the Capitol Police that ultimately led to criminal charges against Shorter. See Arrest Warrant Aff. at 1–6; Docket Summary at 1; Docket at 1. The Architect also relied on the OIG's Report, which was itself based on the Capitol Police investigation of the matter and interviews with other Architect employees. See OIG Report 1–7. These investigations reached similar, noncontradictory conclusions on Shorter's conduct; accordingly, the Architect's explanation is "facially 'credible' in light of the proffered evidence." See Figueroa, 923 F.3d at 1088 (quoting Bishopp, 788 F.2d at 788–89).

Lastly, the Architect furnishes a "clear and reasonably specific explanation" for terminating Shorter's employment. Id. (quoting Segar v. Smith, 738 F.2d 1249, 1269 (D.C. Cir.

1984) (internal quotation marks omitted)).  The Architect terminated Shorter because of her "extensive and ongoing practice of stealing," to which she herself confessed in an interview with the Capitol Police.  Def.'s Mem. at 10–11; see Arrest Warrant Aff. at 1–6; Nov. 2 Gilles Letter at 1–3; Jan. 12 Termination Letter at 1–2.  The Architect explained to her that termination was appropriate in light of "the seriousness of the offense, the effect it had on Shorter's supervisors' trust in her, and the consistency of the penalty with other like cases."  Def.'s Mem. at 10–11.

### B.  Shorter's Evidence of Pretext and Prohibited Discrimination

Since the Architect has "articulate[d] a legitimate, nondiscriminatory reason for its action," the burden now "'shifts back' to [Shorter], who must prove that, despite the proffered reason, she has been the victim of intentional discrimination."  Figueroa, 923 F.3d at 1086 (quoting Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016)).  To do so, she must "produce[] sufficient evidence for a reasonable jury to find that the [Architect's] asserted non-discriminatory reason was not the actual reason and that the [Architect] intentionally discriminated against [Shorter] on a prohibited basis."  Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

Courts approach this task by inquiring whether "the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer."  Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting Aka v. Wash. Hospital Ctr., 156 F.3d 1284, 1289, 1291 (D.C. Cir. 1998) (en banc)).  For instance, a plaintiff can support her claim of pretext by showing "the employer's better treatment of similarly

situated employees outside the plaintiff's protected group, . . . its deviation from established procedures or criteria," or other evidence of underlying discrimination.  Walker, 798 F.3d at 1092.

Nonetheless, in a Title VII suit, "a plaintiff will not survive summary judgment where the plaintiff create[s] only a weak issue of fact as to whether the employer's reason [for the termination] was untrue."  Oviedo v. Washington Metro. Area Transit Auth., 948 F.3d 386, 395 (D.C. Cir. 2020) (internal quotation marks omitted).  And when relying "solely on evidence of pretext," a plaintiff "must demonstrate that a 'reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason.'"  Walker v. McCarthy, 170 F. Supp. 3d 94, 104 (D.D.C. 2016) (quoting Walker, 798 F.3d at 1096), aff'd, No. 16-5192, 2017 WL 160806 (D.C. Cir. Jan. 3, 2017).

Shorter argues that the Architect's proffered explanation for her termination was pretextual because the Architect treated similarly-situated male and/or non-Hispanic employees more favorably.  See Pl.'s Mem. at 15–18 (citing Ex. D, Pl.'s Mem. ("Pl.'s Resp. to Def.'s Interrogs.") [ECF 31-5] ¶¶ 1, 9, 14–15).  Shorter also points to the Architect's disregard for her hoarding condition and its failure to use a progressive disciplinary process as evidence of pretext.  Id. at 10, 19–21 (citing Pl.'s Resp. to Def.'s Interrogs. ¶¶ 1, 9–10, 15).  She further contends that this disparate treatment "raise[s] credibility and motive questions" that require a jury trial, where the credibility of Tzamaras and of other Architect employees involved in her termination can be tested.[1]  Id. at 9, 19–22.  As will be discussed below, however, none of Shorter's arguments is persuasive.

---

[1] Shorter, in her response to an interrogatory by the Architect requesting her to "[f]ully describe . . . any statement by [the Architect's] supervisors, managers, or employees which you believe evidence discriminatory animus towards you," stated that "[M.S.] told [V.G.] that Mr. Tzamaras was fired . . . because he was harassing another female there."  Pl.'s Resp. to Def.'s Interrogs. ¶ 15.  Shorter does not present any evidence to support this assertion, however, and the Court concludes that this passing remark is not sufficient to cast doubt on the Architect's proffered basis for her termination.  See Sage v. Broad. Publ'ns, Inc., 997 F. Supp. 49, 53 (D.D.C. 1998) ("Conclusory allegations made in affidavits opposing a motion for summary judgment are insufficient to create a genuine issue of material fact.").

### a.  Shorter's Comparator Evidence

Shorter first attempts to demonstrate pretext by arguing that the Architect treated her worse than it did her non-Hispanic or male colleagues, who did not face termination despite committing misconduct equal to or worse than hers.  Id. at 10, 16, 18.  Shorter argues that she was "unfairly targeted" because the Architect "did not call the police on other individuals who took [its] property" and "did not move to prosecute people suspected of the same or similar actions for which [Shorter] was targeted."  Id. at 10, 16 (citing Pl.'s Resp. to Def.'s Interrogs. ¶¶ 1, 15).

"One way to discredit an employer's justification is to show that similarly situated employees of a different race," or sex, "received more favorable treatment."  Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO, 548 F.3d 137, 145 (D.C. Cir. 2008).  To prove that "she is similarly situated to another employee, [Shorter] must demonstrate that she and the alleged similarly-situated employee were charged with offenses of comparable seriousness, and that all of the relevant aspects of her employment situation were nearly identical to those of the other employee."  Wheeler, 812 F.3d at 1115–16 (internal quotation marks and alteration omitted).  Among the "[f]actors that bear on whether someone is an appropriate comparator" are "the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  Id. at 1116 (quotation and alteration omitted).

To the best of the Court's understanding, Shorter presents five instances where she contends that male and/or non-Hispanic employees of the Architect were treated better than she was despite committing acts that she alleges were comparable to or worse than hers.  See id. at 16–

17; Ex. H, Pl.'s Mem. ("Jordan Aff.") [ECF No. 31-9] ¶¶ 2–4.[2]  As will be discussed, however, none of these comparators is similarly situated to Shorter.[3]

First, Shorter claims that the Architect did not attempt to remove P.B., a white male, who was caught taking paint belonging to the Architect from the premises, see Pl.'s Mem. at 16–17; Jordan Aff. ¶ 2, or L.T., a white female, who was found to have removed boxes belonging to the Architect from the premises without authorization, see Pl.'s Mem. at 17–18; Jordan Aff. ¶ 3.  But neither of these cases provides an appropriate comparator to Shorter's situation because P.B. and L.T. stole from the Architect only once, see Jordan Aff. ¶¶ 2–3; Tzamaras Dep. Tr. at 21:11–23:13, 27:1–9, 38:6–39:12.  Shorter, by comparison, was believed to have been mishandling Architect property—and likely stealing such property—on a daily basis for almost thirty years.  Hence, their "offenses" were not "of comparable seriousness."  Wheeler, 812 F.3d at 1115–16.  And even if their offenses had been of equal gravity to Shorter's misconduct, she nevertheless fails to provide adequate details about their "job and job duties" at the time of the alleged instances and which supervisor handled their case and disciplined them, all of which are necessary to establish a viable comparator.  See id.

---

[2] Shorter specifically refers to three Architect employees mentioned by their initials in the sworn affidavit of Thomas A. Jordan, see Pl.'s Mem. at 16–17; Jordan Aff. ¶¶ 2–4, and four Architect employees, who Shorter does not name, mentioned in the deposition of Tzamaras, see Pl.'s Mem. at 16–17; Tzamaras Dep. Tr. at 23:14–39:12.  Based on a comparison of the affidavit and the deposition, however, it appears that L.T., who is discussed in the affidavit, Jordan Aff. ¶ 3, is the same person as L.T., whose case is addressed in the deposition, Tzamaras Dep. Tr. at 21:11–23:13, 38:6–39:12, and J.A., who is mentioned in the affidavit, Jordan Aff. ¶ 3, is the same person as the J.A., who is discussed in the deposition, Tzamaras Dep. Tr. at 23:19–25:16, 40:11–41:21.

[3] The Architect contends that the Affidavit of Thomas A. Jordan, see Jordan Aff. at 1–2, "cannot be considered in connection with the Architect's motion for summary judgment because Shorter inexplicably failed to disclose Jordan as a potential witness in her initial disclosures or at any other point in the nearly one[-]year course of discovery in this matter."  Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") [ECF No. 37] at 7–8; see Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  The Court need not decide whether this contention is correct, since even assuming that the Affidavit is admissible, it still does not affect the outcome of the case.

Next, Shorter contends that the Architect did not terminate the employment of an unnamed African-American male who worked as a maintenance mechanic and was arrested. See Pl.'s Mem. at 17. Again, however, this coworker is not similarly situated to Shorter because he was arrested due to "a domestic issue," not theft from the Architect or anything related to his employment. Tzamaras Dep. Tr. at 32:16–33:9. Moreover, this comparison misunderstands the basis for Shorter's termination: she was not terminated because of her arrest alone, but rather her apparent long-term practice of stealing from the Architect. See Def.'s Mem. at 10–11; see also Nov. 2 Gilles Letter at 3 (describing Shorter's conduct as "so egregious that removal [was] warranted" despite her avoiding a criminal conviction through a diversion program). As such, very few "of the relevant aspects of [Shorter's] employment situation were nearly identical to those of the [unnamed] employee." See Wheeler, 812 F.3d at 1115–16.

Third, according to Shorter, the Architect did not remove a male employee J.S., a paint shop supervisor who had been accused of concealing paint belonging to the Architect inside coffee cans and "carrying [these cans] out in his bag." Tzamaras Dep. Tr. at 27:12–28:2, 36:4–36:14. When Tzamaras became aware of this misconduct, Shorter contends, he did not refer this information to the OIG or the Capitol Police, but instead directed another supervisor to confront J.S. See Pl.'s Mem. at 17. But when that supervisor examined the allegedly stolen cans, he found coffee grounds, not paint, thus exonerating J.S. Id. Shorter, by comparison, was caught with cleaning supplies on her person and a locker full of other items belong to the Architect. See Arrest Warrant Aff. at 3. Plus, even if the misconduct were the same, the Capitol Police's involvement was not evidence of Tzamaras treating Shorter and J.S. differently; the Capitol Police were already involved in Shorter's case by the time Tzamaras became aware of it. See Tzamaras Dep. Tr. at

10:11–11:9, 36:15–37:13, 39:21–40:5.  The Capitol Police's involvement in Shorter's case thus provides no basis for concluding that Tzamaras treated her more harshly than he did J.S.

Last, Shorter notes that the Architect did not attempt to remove J.A., a white male who was accused of taking wood from one of the Architect's carpentry shops.  Pl.'s Mem. at 17; Jordan Aff. ¶ 4.  J.A., who was a supervisor at the time of the allegations, see Tzamaras Dep. Tr. at 24:9–11, was also accused of directing other Architect employees to use such wood to build furniture, which he would later remove from the premises and sell for his personal gain, Pl.'s Mem. at 17; Jordan Aff. ¶ 4.  But while the OIG did investigate J.A.'s alleged misconduct, the allegations were never substantiated.  See Tzamaras Dep. Tr. at 23:19–25:16, 40:11–41:21; OIG Report 2–3. Accordingly, J.A. is a not similarly situated comparator for Shorter because there is no comparable evidence that he committed an offense.  See Tzamaras Dep. Tr. at 23:19–25:16, 40:11–41:21; OIG Report 2–3.

Shorter's remaining arguments based on comparative evidence are equally unavailing. Shorter's general assertion that she was "aware of other employees who stole wood, copper, shrubs[,] and other items from [the Architect] and were not criminally prosecuted, proposed for removal[,] or removed," Pl.'s Mem. at 17–18, lacks sufficient detail for a factfinder to determine whether these coworkers were actually similarly situated to her, see Wheeler, 812 F.3d at 1114– 16.  This conclusory statement is also too vague to provide proper comparator evidence or to overcome summary judgment.  See Johnson v. Perez, 823 F.3d 701, 710–11 (D.C. Cir. 2016).  The same is true for Shorter's claim that she heard, secondhand, "that there were many people who do all kinds of things and they are not fired."  See Pl.'s Mem. at 11, 16.[4]

---

[4] According to the Architect, "this statement [is] buried in layers of hearsay."  Def.'s Reply at 6 n.2.  The Court need not wade into what evidentiary weight to give to these statements, however, since even if this statement is not hearsay, it is still too vague and nonspecific to affect the outcome of this case.

Shorter's statement that the Architect "decided to cause the Capitol Police to stop [her]," while failing to notify the police about her "co-workers, of a different race, who were stealing items from the [Architect],"[5] Shorter Aff. ¶ 14, similarly fails to demonstrate pretext.  First, Shorter is wrong on the timeline: while the OIG did share with the Capitol Police information about the anonymous complaint it had received on May 17, 2017, see OIG Report at 1, the Capitol Police's investigation was launched following a different anonymous tip on December 14, 2016, see id.; Arrest Warrant Aff. at 1.  Second, on at least one other occasion, the Architect notified the Capitol Police about a male employee who was suspected of stealing.  See Tzamaras Dep. Tr. at 29:11–31:18.  Moreover, it is unclear what exactly Shorter means in saying that the Architect "did not move to prosecute people suspected of the same or similar actions for which [she] was targeted," Pl.'s Mem. at 16.  There is no record of the Architect itself pressing any charges against Shorter; rather, she was prosecuted based on the Capitol Police's investigation into her conduct, Docket Summary at 1; Docket at 1–2.

In sum, Shorter fails to establish any pretext by way of comparator evidence.  The Architect presents evidence that it has previously proposed the removal and termination of employees outside of Shorter's protected class who "were accused of removal of government property." Bailey Dep. at 13:9–17:4.  Indeed, the conduct of some of these terminated individuals was actually less serious than that attributed to Shorter.  Id.  For instance, the Architect proposed to remove and later terminated the employment of P.H., an African American custodial worker in the Senate

---

[5] The Architect points out that, because Shorter presents "scant evidence" to support this assertion, it is based solely on "information and belief" and is therefore "unacceptable."  Def.'s Reply at 10 (quoting Shorter Aff. at 1; Londrigan v. FBI, 670 F.2d 1164, 1174 (D.C. Cir. 1981)).  But the Court need not decide this issue, since even assuming that Shorter's statement is substantiated, it does not change the Court's conclusion that the Architect's proffered reason for termination was not pretextual.

Office Building, who in 2012 was discovered with the Architect's trash bags and toilet paper in her tote bag.  Id. at 14:20–15:4.

### b.  The Architect's Disciplinary Process and Its Witnesses' Credibility

Apart from her attempt to establish pretext through comparator evidence, Shorter also challenges the credibility of Tzamaras and of Teresa Bailey, a human resources specialist involved in her case, and questions the Architect's failure to use a progressive disciplinary process before terminating her.  See Pl.'s Mem. at 18–22.  Neither argument is persuasive.

To begin, Shorter's contention that the decision-making process by Tzamaras and Bailey was deficient because it did not result in the termination of "other employees [who committed] similar or more egregious acts," id., fails for the same reason that her comparators argument did— those other employees' cases are not similar enough to hers.  Shorter also points to her supervisors' failure to consider her hoarding condition, and to "propose [her] for any form of treatment program," as evidence of pretext.  Id.  This framing of her termination is misleading, however, because Tzamaras specifically noted that he had "considered [Shorter's] recently diagnosed medical condition," but that the diagnosis did not "diminish the seriousness of the offense, the effect it has upon [Shorter's] supervisors' confidence in [her,] and the consistency of the penalty." Jan. 12 Termination Letter at 1.  Shorter marshals no evidence to refute this point, nor does she explain what weight her diagnosis should have been given in the Architect's termination decision.

As for the Architect's alleged failure to follow a "Progressive Disciplinary Process," see Pl.'s Mem. at 21, it appears that Shorter's termination was consistent with the Architect's established system of gradated penalties.  See Tzamaras Dep. Tr. at 32:7–15; Bailey Dep. Tr. at 37:1–9.  According to Section 2 of Article 12 of the Collective Bargaining Agreement governing Shorter's employment, although "[t]he [Architect] may follow the principle of progressive

19

discipline and consider the principle of like penalties for employees with similar disciplinary records, . . . [a]n exception to progressive discipline may be recommended by the proposing official." Ex. 18, Def.'s Reply ("CBA") [ECF No. 37-2] at 23; see Tzamaras Dep. Tr. at 32:7–15; Bailey Dep. Tr. at 37:1–9.  Moreover, while the Agreement states that the "sequence" of "[d]isciplinary and adverse actions [is] normally based on the concept of progressive discipline" and "may follow the AOC's Typical Penalties for Infractions," CBA at 23, the specific punishment for "Theft" is "Removal" at first offense, id. at 111.

Shorter points to no disciplinary policy that contradicts the Agreement's specific provision on theft; she refers only to her own responses to the Architect's interrogatories, see Pl.'s Mem. at 10.  Again, such vague references, absent further support in the record, are not enough to establish that the Architect diverged from its standard employment practices.  Accordingly, Shorter's argument for pretext based on the failure to follow a progressive disciplinary process cannot succeed.

In light of the above, a hearing is not necessary to determine the credibility of Bailey and Tzamaras.  To avoid summary judgment, an employee must provide sufficient evidence such that "a reasonable jury could not only disbelieve the employer's reasons, but [also] conclude that the real reason the employer took a challenged action was a prohibited one." Walker, 798 F.3d at 1093.  Shorter provides no substantiated reason to doubt the Architect's explanation for her termination, and hence summary judgment is appropriate.

## **Conclusion**

For the foregoing reasons, the Architect's motion for summary judgment will be granted.

A separate order will issue on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>August 25, 2020</u>